The next matter, No. 241262, United States v. Steve Leon Waithe. At this time, would Counsel for the Appellant please come to the podium and introduce herself on the record to begin. Good morning, and may it please the Court, my name is Jane Pici, and I represent the Appellant Steve Waithe. I'd like to reserve one minute for rebuttal. You may. In this case, the Court imposed a sentence that was essentially double the guideline sentencing range. This was unreasonable, both procedurally and substantively. The Court's explanation for imposing such a drastic upward variance was insufficient, especially where many of the factors cited by the Court were already accounted for by the guidelines and specific enhancements. The Court's sentence was also based on clearly erroneous facts about Mr. Waithe's conduct on pretrial release, and it failed to take into account the need to avoid unwarranted sentencing disparities, a factor under 18 U.S.C. 3553A, which the Court must consider. We are not talking about a modest variance here. We're not talking about just whether any variance from the guidelines was warranted in this case. Here, the guideline range was 27 to 33 months, and the Court imposed a sentence of 60 months. That sentence was a 122 percent increase. So one of the things that you focus on are the number of victims. Yes. And you say that's included by the guidelines, and it is, but the top of that is 10 victims, and this was close to 60. So that's a six times difference, obviously. Is that a permissible thing for the judge to consider, that the guidelines stop at 10 and there are many, many more victims than that in this case? So the guidelines don't necessarily stop at 10. It's 10 or more. But 10 to infinity is two points, or whatever number of points it is. Correct. In the sentencing guidelines, the Sentencing Commission has determined that that's the aggravating amount of victims in any 2B1.1 case. And so can you, if you say that 60 is worse than 10, I, District Judge, using my 3553 discretion, think 60 is worse than 10, so I'm going to impose an upward variance in part on that difference, is that an error to do so? Is that a policy disagreement with the guidelines? I mean, I framed it as stopped at 10, and you said it's not stopped at 10, it's 10 to infinity. I guess that's my question. It's 10 to infinity. That is definitely the line that the Sentencing Commission has drawn. And the question is, what takes this case out of the mine run of other cases in which that enhancement applies? And I noted in my brief that, in fact, over 25 percent, over a quarter, of cases under the fraud guideline receive that enhancement for 10 or more victims. So it's not necessarily an uncommon occurrence in 2B1.1 cases for there to be a lot of victims. Now, maybe some variance from the guidelines is warranted, because there were over 50 actual victims of Mr. Waithe's conduct. I'm not saying that's an impermissible thing for the court to consider. But to vary to this degree, and without adequately explaining why this is different than any other case that receives that normal sentencing enhancement for having a lot of victims, that's the error here. Okay. And how about the fact that the material here was sexual, and the cyberstalking guideline doesn't per se capture that? The fraud guideline doesn't per se capture that? It does seem to be aggravating in the way Judge Saris described, which it gets right to the privacy interests of the people in a way that might not be accounted for. What's wrong with that argument? So I acknowledge that there's a sexual nature to the offense here, but that was not what Judge Saris said. And that is not one of the things that she cited. She talked about the privacy. And so there was a privacy violation to these people that was extraordinary, somewhere like that. And what I understood her to mean was what this person was asking for was such a violation of trust because of its sexual nature. That sort of seemed implicit in understanding what the crime was and what Judge Saris was saying. I don't totally agree that that's what Judge Saris was saying. I understand that's what the government is arguing, but I think they're putting words in the judge's mouth. I think what was troubling to Judge Saris, especially after hearing from the number of victims who spoke at the sentencing, was the fact that Mr. Waithe had personal relationships with most, if not all, of these victims, and that he betrayed that trust in that relationship. What Judge Saris said was these were people who lost their privacy and their sense of safety. Really a destruction of trust. Many of them really cared for you, Mr. Waithe. They really cared for you, and you just broke some of their hearts. Right, and then you sexually exploited them. If I made the facts about something else that is less personal than that, it seems much less salient. But when you add what the case is about, which everyone in the room knows, everything you just said is aggravated by what he was obtaining from them. Because of his personal nature. I think what you're saying is that the fraud guideline does not account for this type of harm, and I understand that. The fraud guideline is used to dealing with monetary loss, and that's not what this case involved, and in some way the guideline might be inadequate in that. But as far as Judge Saris' stated reasons, she was not fixated on the sexual nature of the crime. She was fixated on the relationship that Mr. Waithe had with the victims and his betrayal of that relationship in committing these crimes. And that, I think, is something that the abuse of trust enhancement already touched upon. I mean, in any case where you're going to receive that extra enhancement, there is going to be these strong feelings of betrayal, because the victim, in some way or another, put their trust. Do you think it would be different if it were money versus what the conduct, what he was obtaining here was? Do you think that that trust violation at least could be viewed differently? I'm not sure, Your Honor. I think people invest their life savings with someone that they trust, and they're often betrayed, and that can feel just as bad to somebody. So I'm not sure that I would say that it's that much different. The guidelines not only accounted for abuse of a position of trust, the large number of victims, at least to some extent here, but I also wanted to point out that there were other characteristics of the crime that were also accounted for by the guidelines. There was an enhancement for obtaining personal information, here the personal photographs. So that was an enhancement that applied. There was an enhancement for use of sophisticated means, namely Mr. Wake's use of anonymized social media accounts and the like in the course of committing the crimes. And as you already alluded to, it was actually the cyber-stalking guideline that controlled the calculation here. And even though that only pertained to one victim, that Mr. Wake's conduct only rose to that level with regard to one victim, it does capture some of the more personal, intimate aspects of the crime here, I think. And what the judge didn't talk about, all of the judge's comments about the... So back to the victims. It's controlled by the cyber-stalking. Was there any, not the fraud guideline, were there any units added because of the fraud guideline? One unit. So if you pulled the victims out, would it still have been one unit, the victim enhancement? I'm not sure. I guess I'm wondering, like, did the way this guideline played out, did the victim thing end up... So one cyber-person put it up here, but he's doing this conduct to a whole bunch of people, and the way the guidelines played out, it just didn't end up making any difference. And so he really got no additional punishment for the multiple victims, which he thought she should. I mean, if the fraud guideline just went away, then this conduct happened to 60 people may not have been accounted for at all. I guess that's what I'm wondering. I don't know, Your Honor, if he took away that enhancement for the number of victims, if the offense level would have been low enough that under the grouping principles it wouldn't add an offense level. Can I quickly ask you about, I think it comes first in your brief, the district court's use of the term crime to refer to the violation of the pretrial release conditions. Is there any indication in the record that the court assumed anything factually regarding the pretrial release violation, or is it simply... Does your argument depend on her use of the word crime? If I may. Yes, please. I think the court's statements were pretty general and not very careful when it came to what exactly Mr. Waiff did while on pretrial release. Is the crime only used in the statement of reasons? That word is only used in the statement of reasons. I do note that on the statement of reasons this was not just a box that was checked. This was something that was deliberately typed in in the line for other reasons. So I disagree with the government that this was just some kind of administrative oversight or clerical error. What Judge Sarah said twice during the sentencing hearing was that he did it again while on release, which seems clear to me along with what she wrote in the statement of reasons. She's misconstruing Mr. Waiff's conduct while on pretrial release as rising to the level of him committing another crime, which was factually not true and clear error. But engaged in much of the same sort of actus reus of the crime in the sense of contacting people through the computer and asking for things? There were some similarities. There were also important differences that make it not a crime. He was using his own account, his own name. He wasn't hacking into people's accounts. There were a lot of important differences that made it not a crime. I understand that it was disturbing. I acknowledge that. His bail was revoked. It's something. But the judge clearly misconstrued the nature of what he did while on release. One minute. Judge Lopez, do you have any questions? There is a box checked on the statement of reasons that says remorse slash lack of remorse. Judge Sarris actually said at the sentencing hearing it was important that lack of remorse played any role in her decision. Respectfully, I take issue with that. I mean, she doesn't maybe use that exact line, but she does say that she was very put off by a letter that her client wrote to her in advance of sentencing. He talks about two books he's writing and the foundation he's setting up and suggesting that the focus is only on what he is doing to improve his life. That letter said nothing about the victim. Now, it's true. It is obfuscation. She did express some remorse, but wasn't Judge Sarris fully entitled to take into consideration and shouldn't we read from what she actually said about how put off she was by that letter? That there was not really genuine remorse. It's the genuine remorse that she was looking for. Why shouldn't we read that statement as supporting what she said in that administrative statement about lack of remorse? So a couple things, Judge. It's pretty clear when you read Judge Sarris' reasoning in pronouncing the sentence that there's a point in which she starts to explain her upward variance. It's before that point that she comments on Mr. Waithe's statement, but when she's actually putting on the record the reasons for her upward variance, there are only the three reasons that I've already pointed to in my brief. The other thing I would say about this supposed or alleged lack of remorse, I think in a case a judge can consider that and can weigh whether they think someone is showing genuine remorse. But I think in this case, it's part of the reason why Judge Sarris, if it was something that Judge Sarris looked to, it was something that made the sentence substantively unreasonable. Because Mr. Waithe, he accepted responsibility in the case without any litigation. At sentencing, he turned and gave an apology, a heartfelt apology to the victims of the crime. In his letter that he wrote to the judge, yes, he talked about the books he's writing and all of that, but he started and he ended the letter with an apology to the victims and an acknowledgement that he was going to address that further when he spoke at sentencing. So I don't think it was reasonable for the judge to vary upward, again, especially to the really extreme degree that we have here from the guidelines, even based a little bit on what she perceived as a lack of remorse, but I don't think is really supported. Thank you. Thank you. Thank you, counsel. At this time, would counsel for the appellee please introduce herself on the record to begin? Good morning again. Karen Eisenstadt for the government. So the district court was fully aware that this was a big variance, and that's why the court warned the parties early in the sentencing hearing that it was considering a variance, and then when counsel was arguing for a sentencing recommendation, gave counsel the opportunity to address certain specific aggravating factors that were concerning the court, and then the court gave a detailed explanation for why the sentence was what it was. The court cited two factors that were not adequately accounted for in the GSR, and explained why in the court's view they're not adequately accounted for in the GSR, and that's the number of victims, which here was 56, and if you count the attempts the court noted, it's 128, which is far above the threshold of 10 for the victim enhancement, and then the way they were victimized, which was not a loss of money, but the nonconsensual taking of nude and semi-nude photographs of them for the defendant and other people's sexual gratification. The court then cited two related factors that are not addressed by the guidelines at all, which is the repetition of the conduct while on pretrial release, and the lack of remorse, and I note that the court, Judge Lopez mentioned the court commenting on the defendant's letter. The court also commented about the remorse issue when she was talking about the repetition of the conduct on release, so it's definitely something that was in the court's mind. She said, I was struck by it, it didn't matter, he's caught, it's not like he sort of acknowledged the harm, like, oh my God, how did I do this, I ruined not just my life, but their lives, instead he did it again. So that was another comment the court made going to that point. That explanation was specifically to just how we should consider the number of victims here and sort of proportionality, and the defense has cited nine cases, I think, to say, like, hey, there are 25% of these cases have many more victims than just 10, and I think I read your brief to say, well, those cases are mostly about hacking, so they're a little bit different than here. Could you just address that? So first of all, just as an initial matter, as the government noted, it doesn't seem like this is necessarily a procedural claim, because the court did consider the issue, and explicitly so, and the court said that the court didn't think these were useful comparators. But since they've also made a substantive reasonableness claim to the merits, in the government's view, there's nothing wrong with the court's reasoning. It was similar to what the government had argued about these nine cases. The issue is that none of these cases that he cited involved personally targeted exploitation of victims on anything close to the scale of what this defendant did. So there were a bunch of cases that were primarily focused on hacking the accounts of strangers, so computer hacking and computer crime. Some of them did involve sexual conduct, though, it seems to me. Well, they were hacking to take photos of women, so that aspect was the part that was similar. That's what they were trying to get. But I think what the court was thinking and what the government had argued is that's not the equivalent of the kind of conduct we're looking here. He did do that, but in addition, we're talking about a defendant who's communicating directly with victims and exploiting his knowledge of their personal insecurities about their bodies to trick them into sending him photos. That is predatory and violating, I think, on a different level entirely from finding out that your Yahoo account got hacked by someone. And just as an example, I point the court to one of the victim's statements. It's a sealed appendix, page 44, where she explains, you know, I had had breast reduction surgery. He knows that. So he emails me and says, I've got a client who's probably going to get one, too. Can she ask you some questions, knowing that she's sensitive about that? And the questions are, well, what do your scars look like? Can you send me some pictures of your breasts with the scars, because I'm worried about that? And then sensitivity in your nipples now? I mean, it's extremely violating in a way that I think is different than a hacking case. So some of those did have a lot of victims, but having a lot of victims of hacking is both different in kind, and it's also a lot easier to have a lot of victims if all you're doing is hacking and you're not sort of personally targeting your exploitation to each victim's insecurities. There were two cases that he cited that had more of the kind of direct conduct between defendant and victim, like in this case. That was the Abrahams case and the Wilson case. But neither of them were on the scale of what the defendant did. So Abrahams, he takes control of computers, he's using the webcams to take images of women, and then he tries to extort them for more images. The conduct has some similarity. He had 12 victims. Then Wilson, this is another guy who's stealing photos, and then he contacts victims to try to extort more photos, so it's the direct contact with the victims. Six victims. And so again, this defendant, 56 victims, and as the court noted, 72 attempts, that's 128 women in total that you're doing this to. In some cases, you just were less successful. So that, I think, was why, when you look at what the court said, the court said, I'm just not seeing these as useful comparators, because none of them capture the full scope of what we're looking at here. Are there any useful comparators? Do you have any cases that you would say affirmatively? No. I think what the government told the court is we looked, and we haven't been able to find anything that really is of the scale and type of conduct we have here. To know the government did not present any cases as comparators and was just arguing sort of from first principles and in terms of the seriousness of the crime as captured by the PSR and then the victim's statements in terms of the harm. I'd like to briefly address also the issue of the statement of reasons. There's nothing in the sentencing transcript that suggests the district court believed that the defendant's pretrial release conduct rose to the level of a chargeable crime. And more importantly, I think, there's nothing in the sentencing transcript at all that suggests that such a belief factored into the court's decision making when it decided to vary. What the district court said was the aggravating factor in her mind is that he did it again, even after being caught and while under release conditions that prohibited him from doing this, like going on the Internet and talking to women at all, because it reflected, quote, an obsessiveness and, again, a quote, you couldn't stop doing it. That's about the conduct. It's not about is it technically chargeable or not, whether under the wire fraud statute or any other statute. If, by contrast, the district court believed that his release conduct was a chargeable crime, and that actually mattered to her, like it was another plus factor, you would expect to see some indication of that in the sentencing record. The court said quite a number of things, asked questions. Well, I would say did it again. When I say that as a colloquial thing and the it, if I take out it and put the word in, it would be one way to look at that as a crime again. Now, you've recast it and I follow you, but then they would say, and that view is married up to the statement of reasons where it is the crime. So when she said it, that's really what she meant. How do I know that? Because that's what the statement of reasons said. So why is that a wrong way to think about it? So I think what Your Honor is getting at is a difference between whether you might think or maybe she didn't think about it either way, like was it a crime, was it chargeable, maybe she just wasn't thinking about the issue, and whether it mattered, which is more, I guess, like of a harmlessness question. Maybe she didn't think about it at all, but if it had mattered and she was really concerned about that aspect of it, as opposed to the similarity of the conduct, which I think everyone understood and defense counsel admitted, that's disturbing, that's an aggravating factor, we get it, then you would think the court would say that. The court just kept saying, you can't stop doing it. You're obsessed with doing this kind of thing. There's just nothing in there that indicates the court was thinking because it's another crime or because that shows you've committed another crime. You're like a recidivist in that sense. There's just nothing in there in the transcript, and it's true the court has at times Was that objected to? Was that ambiguity that might be there raised to the district judge? Are you raising this because you think it's another crime or did that come up at all? No, it didn't come up, and I think when you look at the record, specifically the show cause hearing where he was then detained for the release conduct, it's clear counsel was very alert to the issue of does it meet the parameters that allowed you to charge wire fraud in this case. And so in the government's view, if there was any concern the court might have thought that, and I don't know where the court would have gotten the idea because no one suggested it, but counsel would have objected, but there was no objection. Everyone seemed to understand what was going on, which was like, he's committing the same kind of conduct when he's under strict orders not to do so, and that's a problem. And if that's right, we do these statements of reasons. They don't factor really into it. Is that right? So in the government's view, we've seen cases where the court has used the statement of reasons to shed light on ambiguities in the sentencing transcript. You know, what did the court mean by it? But the government's aware of no case where the court has looked to the statement of reasons, which is an administrative document, to create ambiguities, where when you look just at the sentencing transcript, no one would have any concern that there's any issue here. And in the government's view, that doesn't make any sense, especially here where repeated the crime is a reasonable way, if you're just filling out a form, to sort of convey the concept of repeated the conduct underlying the crime. I mean, this is a form they're filling out. They do need to fill it out, but there's no reason you couldn't use that language to convey the concept that the government is arguing the court understood to be the facts. Judge Lopez. Thank you. The top of the guideline range here is 33 months. The government went in and asked for 84 months, an enormous variance. The government understood that the court will have to worry about under-oriented sentencing disparities in the sentence imposed. I think in response to a question from the gentleman on the call, you acknowledged that you couldn't find any comparators for what you were asking for. Isn't that an acknowledgment that you were asking the court to impose a sentence that would reflect an under-oriented sentencing disparity, and you couldn't find any comparator anywhere in the categories for what you were asking for? Why is that a problem? So I think the issue here is not that we couldn't find a comparator because no one else had gone that high and we wanted something higher than anyone else had done in a similar context. The issue is the conduct here, when you look at it, is a little bit sui generis. It's odd. It's very odd as a wire fraud charge. So it's not surprising, I don't think, that when you look at the universe of cases where people are taking nude photos, which is what I think the defendant was doing, is that there's not a lot of them. And what he did here was an extensive campaign of targeted personal exploitation to all these women he knew, which must have taken a lot of effort and time on his part. It's not just hacking a bunch of cases from your computer. But there just isn't any case we've seen where someone has done that and been sentenced for it. So neither side really had. I mean, in your view, you've identified a constellation of factors that you say are what caused the recommendation, and no side had a case, either high or low, that had those constellation of factors. Is that your argument? That's correct. That's correct.  Okay. All right. Thank you. Thank you. Thank you. At this time, would counsel for the appellant please reintroduce herself on the record? She has one minute rebuttal. Yes. Jane Peachy again for Mr. Waithe. With regard to the need for the court to consider unwarranted sentencing disparities, I understand whenever an attorney is bringing the court's attention to other cases that they think are similar, there are going to be ways to distinguish those cases, and that is what lawyers like to do and argue that no case is exactly alike. This one's a lot worse. This one's not quite as serious. But the nine cases that were presented to Judge Saris as comparators were in the family of Mr. Waithe's case, and none of them involved sentences anywhere near as high as the one imposed by Judge Saris. But there is an important distinction, right? Leveraging personal, coach, player, other types of relationships like that is different than anonymously sort of taking pictures from people that you don't know and don't know you. That seems to be a really significant aggravator in this case. Well, some of the cases I cited were college classmates whose accounts were hacked. These are not just anonymous someone sitting at their computer hacking into hundreds of Yahoo accounts. They went beyond that. But is she right that the scope of those cases was a lot more limited? Some, yes. Some, no. I mean, every case is different, but I still think we're talking about an apples-to-apples comparison. And the government, like you said, as you pointed out, has offered no comparator cases. There was no JSON data available to the court in the pre-sentence report because the sample size was too small. The government, however, at the sentencing hearing, acknowledging how unusual their requested sentences was, said that the government recognizes that and does not take it lightly. It's a recommendation that comes from a huge amount of thought and research regarding other cases around the country. So they say that, but they offer none. So I think that not only goes to the judge's failure to consider it as she must and not just by saying, oh, this is much broader than that. She didn't properly consider it. That was procedural error, but it also goes to the substantive reasonableness of the sentence. It's so far above the only comparators that the court had of similar cases. Thank you. Thank you. Thank you. That concludes argument in this case.